[No. B093683. Second Dist., Div. Three. May 16, 1996.]

PMC, INC., et al., Plaintiffs and Appellants, v.
SABAN ENTERTAINMENT, INC., et al., Defendants and Respondents.

580

584

**COUNSEL**

Christensen, White, Miller, Fink, Jacobs, Glaser & Shapiro, Michael J. O'Connor and Peter C. Sheridan for Plaintiffs and Appellants.

Greenberg, Glusker, Fields, Claman & Machtinger, Michael A. Greene, James E. Hornstein, Jeffrey Spitz, Wendy M. Mesnick, Kinsella, Boesch,

Fujikawa & Towle, Dale F. Kinsella and Gregory J. Aldisert for Defendants and Respondents.

## OPINION

**CROSKEY, J.**—Defendant and respondent Saban Entertainment, Inc. (Saban) held the copyright for the name and likeness of "The Mighty Morphin Power Rangers." Plaintiff and appellant Cosrich, a division of PMC, Inc. (Cosrich), was bidding against defendant and respondent Tsumura International, Inc. (Tsumura) to obtain an exclusive license to market and manufacture items using the Power Rangers name. Saban ultimately entered into an exclusive license contract with Tsumura. Cosrich brought this lawsuit alleging it actually had entered into a prior exclusive contract with Saban, which Saban had breached by entering into the contract with Tsumura. Cosrich also alleged that Tsumura had intentionally interfered with Cosrich's contractual and business relationship with Saban.

Cosrich appeals from the judgment entered after the trial court granted the summary judgment motions of both Saban and Tsumura. We conclude that the cause of action for breach of contract against Saban must fail because there was no formalized agreement which satisfied the Copyright Act's (17 U.S.C. § 101 et seq.) requirement of a signed writing. As to Tsumura, we hold Cosrich cannot assert a cause of action for intentional interference with contract because there was no enforceable contract with which to interfere; as a result, the only available claim against Tsumura has to be based upon an interference with prospective economic advantage. However, that is not viable in this case because Tsumura's actions as Cosrich's competitor were privileged as a matter of law. We therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

In the fall of 1993, Cosrich and Tsumura were each bidding to obtain from Saban an exclusive license to manufacture and market children's cosmetic and toiletry items using the name and likeness of the "Mighty Morphin Power Rangers." The following chronological summary of the negotiations and correspondence between the members of this commercial triangle is sufficient to present the issues which we must decide.

On November 10, 1993, Cosrich's president (Michael Reich) wrote a letter to Saban expressing "my Company's interest in licensing [the Power

---

[1]The matter comes to us after the granting of motions for summary judgment against Cosrich. While there is little or no dispute about the relevant facts, we recite them in the light most favorable to Cosrich.

Rangers] in the toiletries category." The letter confirmed there had been discussions of a license contract with a specified 10 percent royalty rate, a "2 year term and a $50,000.00 Guarantee for the term." Reich also expressed his hope that "we will be able to finalize this deal prior to [a meeting set for November 16]." Attached to the letter was a list of the articles for which Cosrich wished to obtain a license.

On November 18, 1993, Reich met with representatives of Saban. In the meeting, they discussed the proposed license agreement. Saban's representatives told Reich that Saban was positively inclined toward awarding Cosrich the license. Saban's representatives also stated that while other competitors were vying for the license and the final decision would have to be made by Saban's president, they were quite confident Cosrich would be awarded the license. At this meeting, Reich was given a copy of Saban's "Style Guide," a document specifying Saban's proprietary requirements for the licensed products, including artwork, advertising and other aspects of the product line.

Also on November 18, 1993, Saban prepared and internally filed a "deal memo." Deal memos were internal documents which enabled Saban's creative manager to ascertain if submitted artwork was included in a particular license agreement. The deal memo listed Cosrich as licensee, the property was identified as the "Mighty Morphin Power Rangers," the territory was shown as the United States, and distribution outlets were specified. The second page of the memo itemized products and estimated marketing dates.

Tsumura had also submitted a proposal to Saban, but it specified a royalty percentage of only 5 percent. Saban was insisting on a 10 percent royalty (which Cosrich had agreed to pay). Saban asked Tsumura to submit another proposal which would increase the royalty percentage to 10 percent. Tsumura refused to do so, but did submit a new proposal with a royalty rate of 8 percent.

On November 29, 1993, Reich had a conversation with Saban's manager of domestic sales. Saban's manager stated that Saban had decided to award the license to Cosrich in accordance with Cosrich's proposal of November 10, 1993. The items listed in the November 10 communication were discussed, as well as certain changes and modifications which would be granted in the license. Reich agreed to all of these changes. Saban's manager stated that she needed additional information on certain items. Cosrich's president said this would be provided in the next few days. Reich also confirmed the agreement to increase the amount of the guarantee to $50,000. At the end of the conversation, Saban's manager told Reich that she would be preparing

and forwarding to him a written agreement which would incorporate the terms of the license they had agreed upon, as well as standard license provisions for agreements of that kind.

On November 29, 1993, Saban's manager wrote Tsumura and stated that "management has decided to grant the license to another company based on their ability to commit to a higher royalty and FOS rate. . . . I know [Tsumura's offer of 8 percent] was the highest percentage you could reason-ab[ly] offer without cutting into your margins. Therefore, . . . the decision has been made to go with the company who could meet the requirements."

After receiving this communication, Tsumura's agents had a number of telephone conversations with Saban's representatives in which Tsumura's strengths were emphasized. During these telephone calls, Tsumura learned that Cosrich was the competitor that had submitted a better offer.

On November 30, 1993, Reich wrote Saban the following: "We very much appreciated [the] call last night informing us that you have decided to award us the license for MIGHTY MORPHIN POWER RANGERS in the toiletries category. Thank you . . . for the confidence you have shown in Cosrich -- you may be sure we will not disappoint you. [¶] As promised we are already in the process of putting together a comprehensive product line so that when MIGHTY MORPHIN POWER RANGERS toiletries are presented to the trade, they will not be seeing one or two items but a complete program. [¶] Thank you again . . . ."

On November 30, 1993, Cosrich began the development process preparing a Power Ranger line of toilette products. Cosrich expended thousands of dollars on drawings, artwork, clay figurines, plastic molds, labels, packaging and layouts for sales promotions.

On December 1, 1993, Reich directed the following additional letter to Saban: "This letter is in response to your question about the inclusion of figurines in our License Agreement. Please understand that these would only be used as an accessory to be sold with one or more of our licensed articles." Proposed designs and illustrations of certain initial items were attached to the letter. Saban responded the next day, indicating it had received the designs and "[h]ope to have approvals early next week."

A December 15, 1993, letter from Tsumura to Saban stated, "[W]e have here . . . a serious communication problem that seems to be affecting the decision making process. [¶] While we were negotiating with Saban, we thought we were the company because of our strength in the category . . . .

Unfortunately as it turns out, we were not the only candidate and without any further conversation with us, a contract was sent out to another company. That was not fair or honorable to us. [¶] [O]ther licensors are thrilled with our quality, commitment, and strength in the category *and* if you want to maximize your income, we are the company of choice. . . ." (Italics added.)

On December 21, 1993, Tsumura submitted a new proposal to Saban, increasing its guarantee to $250,000 and offering 10 percent royalty rate. In the same communication, Tsumura stated it was surprised to learn that it had any competitor for the license. Saban was apparently concerned about the negotiations and correspondence which it had just concluded with Cosrich. Thus, during the first week of January 1994, Saban countered to Tsumura with the request that Saban be indemnified for any expenses incurred as a result of legal issues which might arise if the license was awarded to Tsumura. Tsumura agreed to this request.

On January 11, 1994, Saban sent a letter to Cosrich stating that, "Saban will not be able to grant you such a license [for a line of health and beauty aids incorporating elements from the television series Mighty Morphin Power Rangers] at this time." In mid-January, Saban entered into a written exclusive license agreement with Tsumura.[2]

On January 20, 1994, Cosrich filed a complaint against Saban and Tsumura.[3] Cosrich sought to prevent Saban and Tsumura "from purporting to convey to others or otherwise interfere with Cosrich's rights under its exclusive licensing agreement with [Saban] to develop, market and sell a line of children's cosmetic and toiletry products using the names and likenesses of characters from the top rated children's television program 'Mighty Morphin Power Rangers.'" Cosrich alleged an oral agreement was formed on November 29, 1993, when Saban "accepted Cosrich's proposal for an exclusive license on the terms set forth in [Cosrich's] November 10, 1993, letter." Cosrich alleged it had "an exclusive license" "for the period of two (2) years from and including November 29, 1993."

As against Saban, Cosrich alleged (1) breach and anticipatory breach of oral agreement, (2) bad faith denial of existence of contract, (3) breach of the

---

[2]Besides granting Tsumura license rights to the Power Rangers, Saban had executed written license agreements with three other entities, Chilton Toys, Bakery Crafts and Tiger Electronics, Inc. Each of these license agreements were lengthy documents of approximately 20 pages, including detailed provisions.

[3]The complaint and this appeal also named Saban Merchandising, Inc. and Saban International Services, Inc. However, the allegations of the complaint only address actions by Saban Entertainment, Inc.

covenant of good faith and fair dealing, and (4) intentional interference with contract and prospective economic advantage. As against Tsumura, Cosrich alleged a *single* cause of action for "intentional interference with contract *and* prospective economic advantage."

After eight months of extensive discovery which established the facts summarized above, Saban and Tsumura filed motions for summary of judgment. On January 11, 1995, the trial court granted the summary judgment motions of Saban and Tsumura.

With regard to Saban, the trial court concluded the alleged oral agreement was unenforceable under federal copyright laws and California's statute of frauds. After concluding there was no enforceable agreement between Saban and Cosrich, Cosrich's other causes of action against Saban were found to have no legal foundation. As to Tsumura, the trial court held there was no claim for intentional interference with contract and prospective business relations because Tsumura was acting as a competitor.[4] Judgment was therefore entered in favor of Saban and Tsumura. Cosrich filed this timely appeal.

## CONTENTIONS OF THE PARTIES

Cosrich contends it had an enforceable license agreement with Saban and Saban's subsequent grant of an exclusive license to Tsumura constituted a breach of that contract. Cosrich argues the federal copyright requirement for a writing and the state statute of frauds were satisfied by various collateral documents. It also argues that federal copyright law does not apply because the grant of the exclusive license by Saban did not constitute the transfer of the requisite "ownership interest." With respect to Tsumura, Cosrich argues that the competition privilege is not available since Tsumura's promise to indemnify Saban was wrongful conduct and Tsumura acted *after* an agreement had been entered into between Saban and Cosrich, and Tsumura had knowledge of such fact.

Saban and Tsumura dispute each of these arguments. They contend that Saban had not entered into an enforceable contract with Cosrich and that Tsumura was acting as a legitimate competitor, simply increasing its offer to Saban.

---

[4]The summary judgment motions were actually motions for summary adjudication because when they were filed, the complaint contained additional causes of action. However, since the remaining causes of action were eventually dismissed, there are no other outstanding issues. For simplicity, we treat the motions as if they were motions for summary judgment.

## DISCUSSION

### 1. *Standard of Review*

■ The matter comes to us after the trial court granted motions for summary judgment. Such motions are to expedite litigation and eliminate needless trials. (*Hood* v. *Superior Court* (1995) 33 Cal.App.4th 319, 323 [39 Cal.Rptr.2d 296].) They are granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *KOVR-TV, Inc.* v. *Superior Court* (1995) 31 Cal.App.4th 1023, 1028 [37 Cal.Rptr.2d 431].) A defendant meets its burden upon such a motion if it proves "one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (o)(2).) Once a defendant or cross-defendant has met this threshold requirement, the "burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists . . . ." (*Ibid.*; *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573 [37 Cal.Rptr.2d 653].)

On appeal, we exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court . . . ." (*Iverson* v. *Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35]; *Union Bank* v. *Superior Court, supra,* 31 Cal.App.4th at p. 579.) "[W]e construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it." (*Szadolci* v. *Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356]; accord, *Lorenzen-Hughes* v. *MacElhenny, Levy & Co.* (1994) 24 Cal.App.4th 1684, 1686 [30 Cal.Rptr.2d 210].)

### 2. *Due to the Failure to Comply With Federal Copyright Law Cosrich Did Not Have an Enforceable Contract With Saban*

■ Cosrich raises issues only with regard to its claim against Saban for breach of contract.[5] Cosrich contends there are issues of fact as to whether an oral agreement for the license can be enforced. This contention lacks merit. The trial court correctly concluded that any purported oral contract was unenforceable under the federal Copyright Act.

---

[5]Thus, Cosrich has waived its rights to raise issues regarding other alleged causes of action. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 742, fn. 1 [131 Cal.Rptr. 873, 552 P.2d 1169].)

a. *A Signed Writing Is Required by Federal Copyright Law*

Section 106 of the Copyright Act sets forth the rights of copyright ownership. This includes the exclusive right to reproduce or to prepare derivative works based upon copyrighted works. (17 U.S.C. § 106(1), (2).) These rights may be transferred through an exclusive license. (17 U.S.C. § 201(d)(2).) If rights are transferred pursuant to an exclusive license, the transfer must be in writing. (17 U.S.C. § 204(a).)

"A 'transfer of copyright ownership' is an assignment, mortgage, *exclusive* license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright . . . but not including a nonexclusive license." (17 U.S.C. § 101, italics added.)

■ "A transfer of copyright ownership . . . is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." (17 U.S.C. § 204(a); *Konigsberg Intern. Inc.* v. *Rice* (9th Cir. 1994) 16 F.3d 355, 356.) "The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do." (*Effects Associates, Inc.* v. *Cohen* (9th Cir. 1990) 908 F.2d 555, 557.) The Copyright Act's writing requirements are intended to force parties to bargain carefully and to determine precisely what rights are being transferred, and at what price. (*Ibid.*) "The writing should also serve as a guidepost for the parties to resolve their disputes: 'Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual understanding, parties need only look to the writing that sets out their respective rights.' " (*Konigsberg Intern. Inc.* v. *Rice*, *supra*, 16 F.3d at p. 357.) To serve the purpose of the statute, the writing "at the very least, [must] be executed more or less contemporaneously with the agreement and must be a product of the parties' negotiations." (*Ibid.*) It must evidence an intent to transfer a copyright. (*Ibid.*)

Unlike common law statutes of frauds (e.g., Civ. Code, § 1624), section 204 of the Copyright Act serves more than an evidentiary function. Without a writing, a transfer of copyright is not valid and the transfer is not effective. (*Konigsberg Intern. Inc.* v. *Rice*, *supra*, 16 F.3d at p. 357; *Pamfiloff* v. *Giant Records, Inc.* (N.D.Cal. 1992) 794 F.Supp. 933, 937.) Further, the writing requirements under section 204 are more stringent than the common law

statute of frauds. The writing must be intended as a memorandum of contract communicated to the other party and the equitable defense of estoppel does not apply. (794 F.Supp. at p. 937; 3 Nimmer & Nimmer, Nimmer on Copyright (1995) § 10.03[A], pp. 10-38.)

> b. *There Was No Writing Signed by Saban, Intended as a Memorandum of Contract, Communicated to Cosrich, Delineating the Terms of the Agreement*

██ Cosrich contends the written contract between itself and Saban consisted of a series of documents. According to Cosrich, these documents were (1) its proposal, (2) Saban's internal deal memorandum, (3) license agreements Saban had with other entities (see fn. 3, *ante*), and (4) Saban's November 29, 1993, letter sent to Tsumura. However, these documents do not satisfy the Copyright Act. There was no memorandum *communicated to the other party* which was *intended as a memorandum of contract.*

Cosrich's proposal was simply that, a proposal to deal; it did not formalize a meeting of the minds. Saban's internal deal memo was a document for its own use, drafted prior to the time Cosrich stated an agreement was reached. It was placed in Saban's personal files, was not communicated to anyone and was not intended to be a memorandum of an agreement to transfer. It simply reflected the terms of a pending proposal and would have had significance only in the event that an exclusive license agreement ultimately was signed with Cosrich.

As to the contracts Saban had with other entities, Cosrich does not suggest it discussed with Saban the terms contained in these agreements; nor were these other contracts ever communicated to Cosrich. Cosrich cannot simply graft provisions from contracts Saban had with other, unrelated entities, and unilaterally import those terms into its own contract. (*Friedman* v. *Bergin* (1943) 22 Cal.2d 535, 537-538 [140 P.2d 1].)

Lastly, Saban's November 29, 1993, letter was sent to Tsumura. It was not directed to Cosrich. While it stated Saban had "decided to grant the license to another company," it never mentioned Cosrich by name, did not detail terms of a contract, nor was it intended as a contract.

Even taken together, these documents do not satisfy the Copyright Act. There was no writing signed by Saban, communicated to Cosrich which was intended to be a license agreement with Cosrich.

### c. *The Grant of an Exclusive License Constitutes a "Transfer of Ownership"*

Nonexclusive licenses can be granted orally because they are specifically excluded from the definition of a "transfer of copyright ownership." (17 U.S.C. § 101; *Effects Associates, Inc. v. Cohen, supra,* 908 F.2d at p. 558.) Cosrich contends the writing requirement of section 204 of the Copyright Act does not apply because the parties did not intend to transfer an exclusive copyright ownership in the Power Rangers. Cosrich argues the agreement was for a "nonexclusive" license. This contention lacks merit; indeed, its assertion by Cosrich is disingenuous.

The entire premise of Cosrich's lawsuit was based upon the claim that it had an exclusive agreement with Saban. Cosrich repeatedly pled it had an "exclusive licensing agreement with [Saban] to develop, market and sell a line of children's cosmetic and toiletry products . . . ." We take as conclusive admissions of truth the statements in Cosrich's pleadings. (*Pinewood Investors v. City of Oxnard* (1982) 133 Cal.App.3d 1030, 1035 [184 Cal.Rptr. 417]; *Coy v. County of Los Angeles* (1991) 235 Cal.App.3d 1077, 1088, fn. 7 [1 Cal.Rptr.2d 215].)

Cosrich, argues that there was no intent to transfer an exclusive license because there was no intent to transfer an entire bundle of rights.[6] However, the Copyright Act specifically contemplates dividing exclusive copyright interests. (17 U.S.C. § 201(d)(2); *Wales Indus. Inc. v. Hasbro Bradley, Inc.* (D.C.N.Y. 1985) 612 F.Supp. 510, 514, disapproved on another point in *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.* (2d Cir. 1985) 780 F.2d 189, 194, fn. 7.) Narrow rights can be transferred "yet still constitute a 'transfer of ownership,' provided the licensed rights are exclusive." (*Library Publications, Inc. v. Medical Economics Co.* (E.D.Pa. 1982) 548 F.Supp. 1231, 1233 affd. 714 F.2d 123; accord, 3 Nimmer & Nimmer, Nimmer on Copyright, *supra,* § 10.02[A] [B], pp. 10-23 to 10-27.) Thus, even if the rights to be conveyed were narrow, since an exclusive license was contemplated, a writing was required.[7]

---

[6]Cosrich's reliance on *Pamfiloff v. Giant Records, Inc., supra,* 794 F.Supp. 933 is misplaced. In *Pamfiloff* the right to *record* musical compositions was found not to have been a transfer of ownership. In contrast, the entire purpose of the negotiations between Saban and Cosrich, as stated in Cosrich's complaint, was to formulate an "exclusive licensing agreement with [Saban] to develop, market and sell a line of children's cosmetic and toiletry products using the names and likeness of . . . 'Mighty Morphin Power Rangers.' " By its terms, this would be a transfer of ownership.

[7]Cosrich admits the Copyright Act preempts any state law which seeks to "validate an oral transfer of copyright ownership . . . ." Since the transfer sought to be validated was

### 3. Since Cosrich Did Not Have an Enforceable Contract With Saban, It Is Limited to a Cause of Action Against Tsumura for Interference With Prospective Economic Advantage

Cosrich pled one cause of action against Tsumura, labeling it "interference with contract and prospective economic advantage."[8] As such, Cosrich inartfully combined two torts, interference with contract and interference with prospective economic advantage. We have already concluded that any purported contract with Cosrich did not satisfy the writing requirements of the Copyright Act. Therefore, the "contract" on which Cosrich relies was unenforceable. Before we can determine if summary judgment was appropriately granted as to the interference cause of action against Tsumura, we must discuss these two business torts and the relevancy of the unenforceable contract between Cosrich and Saban.[9]

#### a. Interference With Contract—Interference With Prospective Economic Advantage

Interference with contract has been referred to as a species of the broader tort of interference with prospective economic relations.[10] (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 260 [45 Cal.Rptr.2d 90].) The two torts had their origin in the same line of cases and the

---

copyright ownership, we need not discuss the California statute of frauds. (Civ. Code, § 1624.)

[8]State causes of action may be preempted by the federal Copyright Act. When the cause of action is merely a guise for an encroachment of the federal laws, the state cause of action is preempted. (*Motown Record Corp.* v. *George A. Hormel & Co.* (C.D.Cal. 1987) 657 F.Supp. 1236, 1239; 1 Nimmer & Nimmer, Nimmer on Copyright, *supra*, § 1.01[B] at pp. 1-12 to 1-18; 17 U.S.C. § 301.) However, when an extra element is added by virtue of the charges, state causes of action may be brought. (1 Nimmer & Nimmer, Nimmer on Copyright, *supra*, § 1.01[B] at pp. 1-12 to 1-18.) Here, the gravamen of the allegations against Tsumura are not that it wrongfully used the copyright, charges which would fall under the umbrella of the federal act. Rather, the alleged tortious activity was that Tsumura prevented Cosrich from finalizing a deal with Saban. This conduct is qualitatively different from conduct charged as an infringer. Thus, the federal act does not preempt Cosrich's tort claims against Tsumura. (Compare with *Motown Record Corp.* v. *George A. Hormel & Co., supra*, 657 F.Supp. 1236 [claims for unfair competition, intentional and negligent interference with prospective business advantage preempted when allegations arise from defendants' alleged use in advertising, without permission, of copyrighted tune and image of performing artist group]; *Gemcraft Homes, Inc.* v. *Sumurdy* (E.D.Tex. 1988) 688 F.Supp. 289 [claim for interference with contract preempted on allegations that defendants used architectural plans].)

[9]The Supreme Court has recently provided a thorough discussion of the historical development and competing rationales of these two torts. (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 381-391 [45 Cal.Rptr.2d 436, 902 P.2d 740].) We need not repeat that discussion.

[10]Interference with "prospective economic advantage," has also been called "prospective contractual relations" or "prospective economic relations." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th at p. 378.)

discussions often become muddied. (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.*, *supra*, 11 Cal.4th at pp. 381-391 (*Della Penna*).) Both torts enable a party to a contract to sue a stranger to that contract for interfering with the contract and both require an intentional act. (*Pacific Gas & Electric* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587].)

A stranger to a contract may be liable in tort for "intentionally interfering with the performance of the contract. [Citations.] The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Pacific Gas & Electric* v. *Bear Stearns & Co.*, *supra*, 50 Cal.3d at p. 1126.)

■ "The tort of intentional . . . interference with prospective economic advantage imposes liability *for improper* methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition. [Citation.] It is premised upon the principle, ' "[e]veryone has the right to establish and conduct a lawful business and is entitled to the protection of organized society, through its courts, whenever that right is unlawfully invaded." '[Citation.]" (*Settimo Associates* v. *Environ Systems, Inc.* (1993) 14 Cal.App.4th 842, 845 [17 Cal.Rptr.2d 757], italics added.) "The elements of the tort include (1) the existence of a prospective business relationship containing the probability of future economic rewards for plaintiff; (2) knowledge by defendant of the existence of the relationship; (3) intentional acts by defendant designed to disrupt the relationship; (4) actual causation; and, (5) damages to plaintiff proximately caused by defendant's conduct. [Citation.] The general wrong inherent in this tort is the unlawful interference with a business opportunity through methods which are not within the privilege of fair competition. [Citation.]" (*Ibid.*; accord, Rest.2d Torts, § 766.)

### b. *Pre-Della Penna California Case Authority*

■ In its simplest terms, to be liable for inducing breach of contract, there must be a valid contract. (*Pacific Gas & Electric* v. *Bear Stearns & Co.*, *supra*, 50 Cal.3d at p. 1126.) In comparison, a cause of action for interference with prospective economic advantage necessarily assumes that a contract has not yet been formulated. However, even this seemingly simple line of demarcation is blurred. A "valid" contract has not heretofore been defined

as synonymous with an "enforceable" contract. This issue is raised when there is conduct amounting to a tortious interference, yet there is no enforceable contract. Typically discussed when a contract cannot be enforced due to the statute of frauds, the issue can also arise if a contract is voidable by reason of containing uncertain terms, lack of consideration or lack of mutuality. (Rest.2d Torts, § 766, com. f.)

In *Zimmerman* v. *Bank of America* (1961) 191 Cal.App.2d 55 [12 Cal.Rptr. 319], the appellate court held causes of action for both torts may be pled even if the underlying contract was "voidable." In *Zimmerman* a real estate agent's lawsuit against a bank alleged the bank maliciously induced third parties to breach the agent's oral agreement to arrange for the sale of property. The brokerage agreement fell outside the statute of frauds, and thus was voidable. *Zimmerman* held the agent could nonetheless state a cause of action against the bank. *Zimmerman* focused on the philosophical underpinnings of these two business torts which is the interference with an advantageous relationship, "not necessarily the breach of a contract." (*Id.* at p. 57.) "The tort of interference with an advantageous relationship, or with a contract, does not, however, disintegrate because it relates to a contract not written or an advantageous relation not articulated into a contract. The nature of the tort does not vary with the legal strength, or enforceability, of the relation disrupted. The actionable wrong lies in the inducement to break the contract or to sever the relationship, not in the kind of contract or relationship so disrupted, whether it is written or oral, enforceable or not enforceable." (*Ibid.*) *Zimmerman* also reasoned that even though the party to the unenforceable contract could stand on the statute of frauds and not be held for a breach, the third party bank could not take advantage of such a defense. (*Id.* at pp. 60-61.)

The reasoning of *Zimmerman* has been adopted in a number of California cases.[11] However, there is confusion as to whether its holding is applicable to both interference with contract as well as interference with prospective economic relations. (*Pacific Gas & Electric* v. *Bear Stearns & Co., supra*, 50 Cal.3d at p. 1128, fn. 4; *Di Lorenzo* v. *Stewart Title Guar. Co.* (1965) 232 Cal.App.2d 839, 843 [43 Cal.Rptr. 261].) Many cases deal only with, or seem to deal only with, the tort of interference with prospective economic relations (*Buckaloo* v. *Johnson, supra*, 14 Cal.3d 815; *Shida* v. *Japan Food*

---

[11]Many of the early cases dealt with oral real estate commission agreements, as did the subsequent Supreme Court case of *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815 [122 Cal.Rptr. 745, 537 P.2d 865], limited by *Della Penna, supra*, 11 Cal.4th at p. 393, fn. 5; *Golden* v. *Anderson* (1967) 256 Cal.App.2d 714 [64 Cal.Rptr. 404]; *Friedman* v. *Jackson* (1968) 266 Cal.App.2d 517 [72 Cal.Rptr. 129]; *Allen* v. *Powell* (1967) 248 Cal.App.2d 502 [56 Cal.Rptr. 715, 29 A.L.R.3d 1218] disapproved on another point in *Heckmann* v. *Ahmanson* (1985) 168 Cal.App.3d 119, 134, fn. 8 [214 Cal.Rptr. 177].)

*Corp.* (1967) 251 Cal.App.2d 864 [60 Cal.Rptr. 43]), and at least one commentator suggests *Zimmerman*'s holding is properly limited to cases of prospective advantage. (3 Levy et al., Cal.Torts (1995) § 40.111[5], pp. 40-152 to 40-153.)[12]

The lack of clear lines distinguishing the two torts is aggravated because in discussing if a "valid" contract is required, the cases also make a distinction between contracts which are "void" as compared to those which are "voidable." (*Shamblin* v. *Berge* (1985) 166 Cal.App.3d 118, 124 [212 Cal.Rptr. 313].) ▮ It is settled that if a contract is "void," there can be no claim for interference with contract; there may only be a cause of action for interference with a *prospective* relationship. (*Ibid.*, citing Prosser & Keeton, Torts (5th ed. 1984) § 129, pp. 994-995, and Rest.2d Torts, § 766, com. f, at p. 10; *Mindenberg* v. *Carmel Film Productions* (1955) 132 Cal.App.2d 598, 602 [282 P.2d 1024]; cf. *A-Mark Coin Co.* v. *General Mills, Inc.* (1983) 148 Cal.App.3d 312, 323 [195 Cal.Rptr. 859] distinguished in *SCEcorp.* v. *Superior Court* (1992) 3 Cal.App.4th 673, 678-679 [4 Cal.Rptr.2d 372].) Relying on *Zimmerman*, however, some cases seemed to hold that if the contract is merely "voidable" then an action for interference with contract will lie. (E.g., *Kozlowsky* v. *Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 598 [86 Cal.Rptr. 52]; *Shamblin* v. *Berge, supra*, 166 Cal.App.3d at p. 124.)

The distinction, which permits claims based upon a "voidable" but not a "void" contract is premised upon the contract principle that a "contract" is an enforceable promise and that a promise may be valid, even though its resulting contract may be voidable. (Rest.2d Torts, § 766, com. f.)[13] In contrast, a "void" contract, e.g., one lacking legal subject matter or consideration, or violating public policy or statutory law, is a "promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor . . . ." (Rest.2d Contracts, § 7, com. (a).)

---

[12]*Pacific Gas & Electric* v. *Bear Stearns & Co., supra*, 50 Cal.3d at page 1128, footnote 4 questioned this characterization of the law. In doing so it stated ". . . it may be preferable not to distinguish the two as separate torts." (*Ibid.*) However, in *Della Penna*, the Supreme Court specifically directs courts not to blur the analytical difference between the two. (11 Cal.4th at p. 392.)

[13]The reasoning is as follows: "The third person may have a defense against action on the contract that would permit him to avoid it and escape liability on it if he sees fit to do so. Until he does, the contract is a valid and subsisting relation, with which the actor is not permitted to interfere improperly. [Although the person making the promise] may be in a position to avoid liability for any breach[, t]he defendant actor is not, however, for that reason free to interfere with performance of the contract before it is avoided." (Rest.2d Torts, § 766, com. f; *Friedman* v. *Jackson, supra*, 266 Cal.App.2d at p. 522.)

### c. *Case Authority in Non-California Jurisdictions*

Various American jurisdictions have taken differing views as to the effect a "void," "voidable," or "invalid" contract has on these two torts. Some jurisdictions group the two torts together and merely discuss "void" versus "voidable" contracts. Others formulate the discussion in terms of the specific ground for unenforceability and may, for example, permit causes of action if the defect is due to the statue of frauds, but not if unenforceability is based upon uncertainty. (See Annot. (1979) 96 A.L.R.3d 1294, and later cases (1995 pocket supp.) pp. 267-270; see also Rest.2d Torts, § 766, com. f.)

Other jurisdictions, however, have begun to formulate clear lines of demarcation based upon more logical and understandable rules. In these jurisdictions, to plead a cause of action for interference with contract, an *enforceable* contract is required.[14] Otherwise, the appropriate cause of action is intentional interference with a *prospective* relationship and the plaintiff must then prove an unlawful motive for the action as well as cope with a broader competition privilege.

In *Guard-Life Corp.* v. *S. Parker Hardware Mfg.* (1980) 428 N.Y.S.2d 628 [50 N.Y.2d 183, 406 N.E.2d 445], the New York high court was faced with a distributorship contract which was interfered with by another. The underlying contract was unenforceable for lack of mutuality. The court concluded that only a cause of action for intentional interference with prospective business relations could be brought, and not a claim for intentional interference with contract. (Accord, *Nifty Foods Corp.* v. *Great Atlantic & Pac. Tea Co.* (2d Cir. 1980) 614 F.2d 832, 837, superseded by statute on another point as stated in *Rosenfeld* v. *Basquiat* (2d Cir. 1996) 78 F.3d 84, 93.)

*Guard-Life* reasoned that "The distinction . . . between the possible liability of a competitor for interference with performance of an existing contract and the more demanding requirements to establish liability for interference with prospective contractual relations reflects a recognition of the difference in the two situations in the relationship of the parties and in

---

[14]*Birmingham Television Corp.* v. *DeRamus* (Ala.App. 1986) 502 So.2d 761] questioned on another point in *Affiliated Paper Companies, Inc.* v. *Hughes* (N.D.Ala. 1987) 667 F.Supp. 1436, 1448-1449 (contract unenforceable as unreasonable restraint of trade cannot support an interference with contract tort as a valid, enforceable contract is required); *Advance Industrial Sec.* v. *William J. Burns I. D. Agency* (5th Cir. 1967) 377 F.2d 236 (contract made by foreign corporation unqualified to do business in state is void and will not support interference with contract claim as this cause of action presupposes enforceable contract); *Wedgewood Carpet Mills, Inc.* v. *Color-Set, Inc.* (1979) 149 Ga.App. 417 [254 S.E.2d 421] (contracts lacks mutuality and is restraint of trade cannot support interference with contract as enforceable contract required); *Barnes Group, Inc.* v. *C & C Products, Inc.* (4th Cir. 1983) 716 F.2d 1023, 1027 (Ohio).

the substance and quality of their resulting interests; greater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interests in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer). [¶] . . . [If the contract is voidable for lack of mutuality] . . . the contract will continue to be operational until action on the part of the other contracting party brings it to a halt . . . . [¶] . . . [¶] . . . [T]he state of mind of the interfering tort-feasor [should not] be determinative. While it must be established, as a threshold predicate for any claim of tortious interference, that the alleged tort-feasor knew that his competitor had a contract with the third party, as a practical matter he will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract . . . . He will seldom if ever know whether the third party has a right to terminate or is entitled to avoid the contract. . . . [¶] *In sum, the imposition of liability for intentional interference with performance of a contract . . . must depend on the worth and significance of the objective interest to be protected.* [When] a contract . . . may be avoided by the other contracting party at his election . . . the party seeking to impose liability enjoys no legally enforceable right to performance; his interest is a mere expectancy—a hope of future contractual relations." (*Guard-Life Corp.* v. *S. Parker Hardware Mfg.*, *supra*, 406 N.E.2d at pp. 449-450, italics added.)[15]

### d. *Under Della Penna, If There Is No Enforceable Contract, the Plaintiff Is Limited to a Cause of Action for Interference With Prospective Economic Advantage*

In our view, the line of demarcation in *Guard-Life* is proper. It is logical to force the plaintiff to plead and prove an enforceable contract when stating a cause of action for intentional interference with contract. If a party is not obligated to perform a contract and may refuse to do so at his election without penalty, then the other party to that agreement enjoys nothing more than an expectancy. A stranger intentionally interfering with that relationship quite obviously does not disturb an enforceable contract but only a

---

[15]*Guard-Life* discusses both voidable and at-will contracts. We believe its rationale is persuasive in arguing for a clear line of demarcation between an enforceable contract and an unenforceable contract with regard to the interference torts. However, we question its holding and discussion as it relates to situations in which the defendant interferes with an at-will contract. In California, an at-will contract is an *enforceable* contract and thus it may be actionable to interfere with that contract. (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 39 [172 P.2d 867], superseded by statute on another point as stated in *Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257, 269 [41 Cal.Rptr.2d 220, 895 P.2d 56]; *Kozlowsky* v. *Westminster Nat. Bank*, *supra*, 6 Cal.App.3d at p. 598; *Freed* v. *Manchester Service, Inc.* (1958) 165 Cal.App.2d 186, 188 [331 P.2d 689].)

*prospective* economic relationship. Thus, there should be no distinction between an underlying contract which is "void" or "voidable," at least with respect to the question of whether the injured plaintiff should be limited to a cause of action for interference with a *prospective* relationship when *either* contractual defect is present.

 Impetus was given to this view by the Supreme Court's decision in *Della Penna.* There, the court addressed one area of confusion with regard to the tort of interference with prospective economic relations, holding a plaintiff had the burden to plead and prove that the interference was wrongful, and that something (which the court declined to identify or define) more than the interference itself, had to be established. In reaching this conclusion, the Supreme Court noted the "need to draw and enforce a sharpened distinction between claims for the tortious disruption of an *existing* contract and claims that a *prospective* contractual or economic relationship has been interfered with by the defendant. . . . [I]n our view and that of several other courts and commentators, the notion that the two torts are analytically unitary and derive from a common principle sacrifices practical wisdom to theoretical insight, promoting the idea that the interests invaded are of nearly equal dignity. They are not.

"The courts provide a damage remedy against third party conduct intended to disrupt an *existing contract* precisely because the exchange of promises resulting *in such a formally cemented economic relationship* is deemed worthy of protection from interference by a stranger to the agreement. *Economic relationships short of contractual, however, should stand on a different legal footing as far as the potential for tort liability is reckoned.* Because ours is a culture firmly wedded to the social rewards of commercial contests, the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties.

"*A doctrine that blurs the analytical line between interference with an existing business contract and interference with commercial relations less than contractual is one that invites both uncertainty in conduct and unpredictability of its legal effect.* The notion that inducing the breach of an existing contract is simply a subevent of the 'more inclusive' class of acts that interfere with economic relations, while perhaps theoretically unobjectionable, has been mischievous as a practical matter. *Our courts should, in short, firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant.*" (*Della Penna, supra,* 11 Cal.4th at p. 392, italics in 2d & 3d pars. added.)

■ Recognizing the logic of the court's analysis in *Guard-Life* and giving obedience to the mandate of *Della Penna*, we are compelled to conclude that a cause of action for intentional interference with contract requires an underlying *enforceable* contract. Where there is no existing, *enforceable* contract, only a claim for interference with prospective advantage may be pleaded. To do otherwise unnecessarily confuses the two torts and fails to recognize their inherent differences. The tort of interference with contractual relations protects an *existing, formally cemented* economic relationship. The tort of interference with prospective business relations protects nonformalized or anticipated business relationships which are reasonably certain to occur, but which are nonetheless *prospective*. Thus, if a plaintiff is to be successful in the former, it is necessary that an enforceable contract be pled and proven.

Requiring a plaintiff to prove an enforceable contract in support of an action for intentional interference with contract creates a critical distinction between the two torts. It defines their boundaries. It also gives greater dignity to a formalized, enforceable agreement. "A party to an enforceable contract possesses a clearly understood expectancy of receiving the contract's benefits. An individual pursuing a mere business relationship and seeking to consummate a prospective contractual agreement has a significantly lesser expectancy of economic gain. Therefore, parties conducting business without a valid subsisting contract who possess only a prospective hope of a contractual relationship are obligated to accept a more aggressive exercise of the competing rights of others. Accordingly, the law affords a significantly expanded latitude for third party interference with a prospective contractual relationship than with a valid existing contract. [¶] . . . Absent a legally enforceable contract between the parties, the two torts blur imperceptibly on the expectancies spectrum, and the elements and burdens of the two torts essentially merge." (Sales, *The Tort of Interference with Contract: An Argument for Requiring a "Valid existing Contract" to Restrain the Use of Tort Law in Circumventing Contract Law Remedies* (1991) 22 Tex. Tech L.Rev. 123, 136-137, fns. omitted.)

We thus see no practical distinction between the prospective nature of a relationship based on pending negotiations and one based on an actual, but unenforceable agreement. In order to be valuable to the plaintiff, both depend on the willingness of the other "contracting" party to conclude or perform the "agreement," an act which the other party is not legally required to do. Further, it makes no logical sense to differentiate between "void" or "voidable" contracts. In either situation, the other party to the contract controls performance and can elect to continue to perform or discontinue performance, without concern for contractual liability. Permitting an aggrieved party to sue for prospective interference only "preserves the concept

of fair competition while refusing to grant a party a benefit to which he is not entitled." (Grothe, *Interference With Contract in the Competitive Marketplace* (1989) 15 Wm. Mitchell L.Rev. 453, 464.)

These two distinct torts have been formulated in recognition of the need to balance two different interests—the need for stability in expectancy of contracts and the need to encourage competition. The distinction between the two lies in the different balance given to these concepts. By limiting the plaintiff to a cause of action for prospective advantage when there is no underlying enforceable contract, a proper balance is achieved. It forces the plaintiff, who now must rely on the prospective tort, to provide evidence of wrongful conduct demonstrating an " 'intent to do something which takes the defendant's acts beyond those of a mere competitor securing business for himself.' [Citation.]" (*Della Penna, supra,* 11 Cal.4th at p. 391.)

This conclusion also provides a realistic foundation for litigation and recognizes the practical realities of administering these cases in the courts. Our conclusion does not deprive a plaintiff from recovering from a wrongdoer. Rather, it merely recognizes the importance of enforceable contracts. If there is an enforceable contract, the plaintiff may plead a cause of action against a stranger for interfering with that contract. If there is no enforceable contract, *for whatever reason,* the plaintiff may only plead a cause of action against the stranger for intentional interference with prospective economic advantage. In the later situation, the defendant third party has a broader privilege of competition.

4. *Plaintiff's Cause of Action for Interference With Prospective Economic Advantage Is Defeated by the Competition Privilege*

a. *The Plaintiff's Additional Burden Under Della Penna and the Defendant's Privilege of Competition*

 With respect to the tort of interference with prospective economic advantage the burden under *Della Penna* requires a plaintiff to plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure *other than the fact of interference itself.* (*Della Penna, supra,* 11 Cal.4th at pp. 378-379, 392-393, adopting and modifying BAJI No. 7.82, italics added.) "Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law or perhaps an established standard of a trade or profession." (*Top Serv. Body Shop, Inc.* v. *Allstate Ins. Co.* (1978) 283 Or. 201 [582 P.2d

1365, 1371], fn. omitted.) Commonly included among improper means are actions which are independently actionable, violations of federal or state law or unethical business practices, e.g., violence, misrepresentation, unfounded litigation, defamation, trade libel or trade mark infringement. (*Id.*, 582 P.2d at p. 1371, fn. 11.)[16] Once the plaintiff has proven an improper motive or an act by improper means, the defendant has the burden of proving it was privileged to act as a competitor.

"Under the privilege of free competition, a competitor is free to divert business to himself as long as he uses fair and reasonable means." (*Tri-Growth Centre City, Ltd.* v. *Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139, 1153 [265 Cal.Rptr. 330].) "[T]he competition privilege is defeated only where the defendant engages in *unlawful or illegitimate means.*" (*San Francisco Design Center Associates* v. *Portman Companies* (1995) 41 Cal.App.4th 29, 42 [50 Cal.Rptr.2d 716], italics added.)[17] " 'The policy of the common law has always been in favor of free competition, which proverbially is the life of trade.' " (*A-Mark Coin Co.* v. *General Mills, Inc., supra,* 148 Cal.App.3d at p. 323.) "Ours is a competitive economy in which business entities vie for economic advantage. . . . [S]uccess goes to him who is able to induce potential customers not to deal with a competitor." (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 828.) "[C]ompetition in business, though carried to the extent of ruining a rival, is not ordinarily actionable provided that the competition does not involve wrongful conduct such as fraud, misrepresentation, intimidation, coercion, obstruction or molestation of the rival or his servants or workmen, or the procurement of the violation of the contractual relationship." (*C. Pappas Co., Inc.* v. *E. & J. Gallo Winery* (D.C.Cal. 1985) 610 F.Supp. 662, 669, affd. 801 F.2d 399; *Charles C. Chapman Building Co.* v. *California Mart* (1969) 2 Cal.App.3d 846, 857 [82 Cal.Rptr. 830].)

" '[I]t is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut

---

[16]Section 767 of the Restatement Second of Torts details the following as important factors: "(a) the nature of the actor's conduct, [¶] (b) the actor's motive, [¶] (c) the interests of the other with which the actor's conduct interferes, [¶] (d) the interests sought to be advanced by the actor, [¶] (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, [¶] (f) the proximity or remoteness of the actor's conduct to the interference and [¶] (g) the relations between the parties."

[17]*San Francisco Design Center Associates* v. *Portman Companies, supra,* citing as examples an Eighth Circuit case and a Massachusetts appellate court case, requires the defendant's action to be "independently actionable." (41 Cal.App.4th at p. 43.) However, it is approved in *Della Penna* for the broader rule quoted. On May 11, 1995, the Supreme Court granted review in *San Francisco Design Center & Associates, supra,* 41 Cal.App.4th 29 (S045788.) It was ordered published on March 14, 1996, following the issuance of *Della Penna* in October 1995.

rates or prices, allow discounts or rebates, enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability.' [Citation.]" (*A-Mark Coin Co.* v. *General Mills, Inc., supra*, 148 Cal.App.3d at pp. 323-324.) Such acts merely maximize competition in a competitive marketplace. (Cf. *Della Penna, supra*, 11 Cal.4th at p. 392.) Thus, there is no tort for offering quantity discounts (*C. Pappas Co., Inc.* v. *E. & J. Gallo Winery, supra*, 610 F.Supp. at p. 669) and it is not actionable to outbid a competitor for a deal. (*Settimo Associates* v. *Environ Systems, Inc., supra*, 14 Cal.App.4th 842.)

### b. *The Record Reflects No Basis for the Tort of Prospective Economic Advantage Against Tsumura*

 As already noted, the cause of action stated by Cosrich against Tsumura combined the tort of intentional interference with contract and the tort of intentional interference with prospective economic advantage. Since no enforceable contract existed between Cosrich and Saban, due to the lack of a writing sufficient to satisfy the Copyright Act, a cause of action for intentional interference with contract cannot be stated.[18] If Cosrich is to have any claim at all, it must rely solely on the tort of intentional interference with prospective economic advantage.

Tsumura was competing with Cosrich for the exclusive license. Saban bargained with each company and ultimately decided to enter into a contract with Tsumura. Before that happened, however, on November 29, 1993, Tsumura was notified that Saban had decided to grant the license to another company. Contrary to Cosrich's claim, this communication did not preclude Tsumura from continuing to pursue the deal, to contact Saban or to continue to negotiate. Tsumura's actions after that time were in pursuit of an exclusive license which had not yet been formally granted to Cosrich. On December 15, 1993, when Tsumura communicated with Saban, it noted it believed "a contract was sent to another . . . ." However, the clear goal of this letter, which began "We . . . have . . . a serious communication problem . . . ," was to correct any communication problems and request that Saban reconsider any decision it had made.

In pursuing the exclusive license, Tsumura's actions were neither underhanded, immoral nor wrongful. Tsumura was actively pursuing a business

---

[18]Tsumura points to the language of 17 United States Code section 204(a) to argue any agreement which does not satisfy the statute's writing requirement is "void" rather than "voidable." Since we have concluded a cause of action for intentional interference requires an *enforceable* contract, this distinction becomes unimportant.

deal—that is what competition is all about. Further, although Cosrich suggests Tsumura used confidential information obtained from Saban when Tsumura increased its offer, Cosrich does not contend it gave that information to Saban in confidence. Saban was trying to obtain the best deal it could when it requested a higher royalty rate from Tsumura. It was playing one competitor against another to increase the value of its bargain. This was not a breach of a fiduciary or confidential relationship. (Compare with *Tri-Growth Centre City, Ltd.* v. *Silldorf, Burdman, Duignan & Eisenberg, supra,* 216 Cal.App.3d 1139.) This was a marketplace in action. Saban sought the most efficient use of its asset, the right to license its popular and well-known products.

Further, the indemnity agreement requested by Saban and granted by Tsumura was fair play. By agreeing to indemnify Saban, Tsumura assumed a potential obligation of Saban, thereby increasing the value of Saban's bargain. It was the direct result of hard negotiating by Saban to obtain the best deal possible. It simply increased the consideration being paid for the license. The indemnity agreement is not against public policy as it does not encourage litigation that was not otherwise likely to occur; it merely reallocates the cost of that event. Further, it does not violate any established business ethics. Saban knew that no written contract existed which would satisfy the Copyright Act's writing requirement. Thus, it could have simply walked away from any negotiations with Cosrich, and not have been held liable. By accepting Tsumura's promise to assume the cost of any potential litigation, Saban was simply making a business decision to take Tsumura's better offer knowing it would be protected if litigation subsequently was commenced by Cosrich. There was no fraud, intimidation, coercion or duress. We see no conduct which rises to what *Della Penna* described as actions which are "wrongful by some legal measure." Tsumura's conduct was neither unlawful nor illegitimate.[19]

---

[19]Cosrich points to *Leonard Duckworth, Inc.* v. *Michael L. Field & Co.* (5th Cir. 1975) 516 F.2d 952 to argue the indemnity agreement, per se, constitutes bad faith. In *Duckworth,* a broker was denied a commission after bringing together a buyer and seller of real estate. The indemnity agreement was part and parcel of surreptitious direct dealings specifically aimed at depriving the broker of a commission already earned. (*Id.* at p. 957.) In contrast, Tsumura and Cosrich were competitors for the same contract.

Cosrich also points to *Charles C. Chapman Building Co.* v. *California Mart, supra,* 2 Cal.App.3d at page 857 to support its position. However, in *Chapman* the appellate court did not determine an indemnity agreement exceeded fair competition. It merely concluded the agreement in issue was not an indemnity agreement.

In other jurisdictions, indemnity agreements, together with some other action suggesting wrongful motive or overreaching, have been held to take the actions outside the scope of fair competition and evidence the unlawful activity giving rise to a claim of interference with prospective economic advantage. (E.g., *Leonard Duckworth, Inc.* v. *Michael L. Field & Co.,*

## CONCLUSION

We have concluded that there could be no tort for interference with contractual relations because no *enforceable* contract existed. Cosrich did not come forward with any evidence to show there was a triable issue of fact on that issue. For the same reason Cosrich's breach of contract action against Saban also fails. Finally, Tsumura has demonstrated that there was no basis for Cosrich's claim of interference with prospective economic advantage. There was no showing by Cosrich that Tsumura had engaged in any wrongful or illegitimate conduct beyond the act of interference itself. This record reflects that Tsumura was simply engaging in hard-nosed and ultimately successful bargaining for the exclusive license also sought by Cosrich. Tsumura was fully protected by the broad competition privilege. The trial court did not err in granting summary judgment in its favor.

## DISPOSITION

The judgment is affirmed. Saban and Tsumura shall recover their costs on appeal.

Klein, P. J., and Kitching, J., concurred.

---

*supra*, 516 F.2d 952; *Downey* v. *United Weather Proofing* (1953) 363 Mo. 852 [253 S.W.2d 976] [false representations and indemnity agreement]; cf. *Jim-Bob, Inc.* v. *Mehling* (1989) 178 Mich.App. 71 [443 N.W.2d 451] [indemnity agreement relevant to show interference with contract].) We have no such additional facts in this case. Other cases, involving an indemnity agreement and dealing only with an interference with contract, where the competition privilege is more narrow, have also found a basis for tort liability. (E.g., *Edward Vantine Stud.* v. *Fraternal Composite* (Iowa Ct.App. 1985) 373 N.W.2d 512 [course of conduct together with indemnity agreement]; cf. *Clements* v. *Withers* (Tex. 1969) 437 S.W.2d 818.) These cases are not applicable here.