112 Cal.Rptr.2d 513 (2002)
92 Cal.App.4th 1112
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, Petitioner,
v.
The SUPERIOR COURT of Los Angeles County, Respondent;
Dewayne Cargill et al., Real Parties in Interest.
CDI Corporation et al., Petitioners,
v.
The Superior Court of Los Angeles County, Respondent;
Dewayne Cargill et al., Real Parties in Interest.
Nos. B148446, B148451.
Court of Appeal, Second District, Division One.
October 16, 2001.
As Modified on Denial of Rehearing November 15, 2001.
Review Granted January 23, 2002.
*517 Horvitz & Levy, Mitchell C. Tilner, Encino, and Jon B. Eisenberg, Oakland; Bergman, Wedner & Dacey, Inc., Gregory M. Bergman, Daphne M. Anneet and Mark W. Waterman, Los Angeles, for Petitioner Metropolitan Water District of Southern California.
Katten Muchin Zavis, Stuart M. Richter, Patricia T. Craigie, Justin M. Goldstein and Donna L. Dutcher, Los Angeles; Freedman & Stone and Marc D. Freedman for Petitioners CDI Corporation, Comforce Technical Services, Inc., H.L. Yoh Company, MD Technical Services Company, Peak Technical Services, Superior Technical Resources, Inc., Superior Staffing Services, Inc., Volt Information Sciences, Inc., Volt Management Corp. and Westaff (USA), Inc.
Musick, Peeler & Garrett, Charles E. Slyngstad, Los Angeles, for County Sanitation District No. 2 of Los Angeles County as Amicus Curiae on behalf of Petitioner.
Jones, Day, Reavis & Pogue, Elwood Lui and Philip E. Cook, Los Angeles; Brown, Winfield & Canzoneri, Inc., Nowland C. Hong, Los Angeles, and Scott H. Campbell, San Francisco, for County of Los Angeles as Amici Curiae for Petitioners.
Myers, Nave, Riback, Silver & Wilson, Arthur A. Hartinger, San Francisco, and Terry Roemer for 104 California Cities, Towns, Counties and Special Districts, and the California State Association of Counties, California Association of Sanitary Agencies, State Water Contractors, California *518 Special Districts Association and Association of California Water Agencies as Amicus Curiae on behalf of Petitioner.
No appearance for Respondent.
Cochran-Bond Connon & Ben-Zvi and Walter Cochran-Bond, Los Angeles; Law Offices of William M. Samoska, Los Angeles, Judy A. Friedman and Richard N. Grey, Encino, for Real Parties in Interest Dewayne Cargill, Anvar Alfi, John Sims, Paul Broussard, Joseph Zadikany, Sun Son, Charlotte Manuel, Steven Minor and Lisa Nelson.
Steptoe & Johnson, Edward Gregory and Sheri T. Cheung, Los Angeles, for Real Party in Interest California Public Employees' Retirement System.
Rothner, Segall & Greenstone, Anthony R. Segall and Julia Harumi Mass, Pasadena, for American Federation for State, County and Municipal Employees Union, Local 1902, AFL-CIO as Amicus Curiae on behalf of Real Parties in Interest.
Bendich, Stobaugh & Strong, David F. Stobaugh, Stephen K. Strong, and Brian J. Waid, Seattle, WA; Krakow & Kaplan and Steven J. Kaplan, Los Angeles; Kalisch, Cotugno & Rust, Lee Cotugno and Mark Kalisch, Beverly Hills, as Amici Curiae on behalf of Real Parties in Interest.
ORTEGA, J.
Since January 1, 1945, the Metropolitan Water District of Southern California (MWD), a public agency, has contracted with the California Public Employees Retirement System (CALPERS) to provide pension, retirement, and other benefits to MWD's employees. Later, MWD sought and obtained new workers. However, these new workers did not become MWD employees. Rather, under contracts between MWD and several private contract service providers (providers), the new workers were made employees of the providers, not MWD. The workers signed employment contracts with the providers which stated the workers were employed by the providers, not MWD. Under these contracts, the providers paid the workers' salaries, withheld taxes, and provided some benefits. However, the benefits generally were significantly less than those provided to MWD employees through CALPERS. MWD selected, assigned, supervised, evaluated, promoted, and disciplined the workers, who were integrated into its workforce. MWD called these workers "temporary independent contractors," "agency" or "district temporary employees," or "consultants," although most worked at MWD for years.
Eventually, the workers, later joined by CALPERS, sued MWD and the providers. The case sought class certification for all similarly situated workers. Among other issues, the workers and CALPERS (collectively, plaintiffs) argued the workers were common-law MWD employees under California's Public Employees' Retirement Law, and thus were entitled to CALPERS enrollment. (PERL; Gov.Code, § 20000 et seq.; all further undesignated section references are to the Government Code.) Plaintiffs argued that, as common-law MWD employees, PERL mandated the workers' enrollment in and eligibility for CALPERS benefits. Plaintiffs contended MWD hired and supervised the workers just like its regular employees, using criteria essentially identical to its mandatory merit hiring system for regular employees, but kept the workers technically employed by the providers as a subterfuge to avoid the cost of providing the more generous CALPERS benefits. Plaintiffs argued the providers were merely a payroll service for MWD, not the workers' employers under the common-law definition.
MWD responded that, apart from the common-law definition of employee, under *519 section 20028, workers are employees eligible for CALPERS benefits only if paid by public funds. Because the workers were paid by the providers, MWD argued the workers were independent contractors, not MWD employees, and as such were excluded from CALPERS eligibility. MWD argued its practice allowed it to save money by temporarily using private workers rather than expanding its permanent workforce. MWD also claimed enrolling the workers in CALPERS would bypass its mandatory merit hiring system, set out in its administrative code, because the workers were not hired under that system. In essence, MWD argues making these workers employees would be hiring them without following MWD's mandatory merit hiring system, the only way it can hire employees under its administrative code.
Supporting MWD, the providers contended that even if the workers were common-law MWD employees, they were the providers' co-employees, and this co-employment status constitutes an exception to the otherwise mandatory CALPERS membership for the workers. The providers also argued the workers waived their CALPERS enrollment rights by contracting to be the providers', not MWD's, employees.
Plaintiffs replied that section 20028 is divided into subdivisions, one governing state and University of California employees, and the other covering workers of other government employers contracting with CALPERS, like MWD. Plaintiffs argue the "paid by public funds" requirement applies only to state, not other governmental, employers. In any event, plaintiffs conclude that, since MWD paid the agencies to provide the workers, MWD essentially paid the workers, satisfying section 20028. Second, plaintiffs also replied that MWD cannot use its technical failure to follow its mandatory merit hiring system to avoid mandatory CALPERS enrollment. Third, they argue that, unlike other statutory schemes which expressly recognize co-employment, PERL does not recognize co-employment status, which we should not judicially read into PERL. Finally, plaintiffs replied that, because CAPERS enrollment and benefit rights are created by statute, not contract, the workers cannot waive their CALPERS rights.
The trial court certified for initial resolution whether MWD was required to enroll the workers in CALPERS. Presented with a summary adjudication motion on this issue, the trial court found, as a matter of law, MWD was required to enroll all common law workers in CALPERS. Because that ruling did not end the case, MWD and the providers sought writ review. We consolidated the petitions and issued an order to show cause.
In addition, we permitted several interested entities to file amicus briefs. Supporting MWD and the providers are many government agencies, including Los Angeles County and its Sanitation District No. 2, which apparently use similar, although not always identical, arrangements for some of their workers. Moreover, Los Angeles County has already been sued in separate litigation raising related issues. Supporting plaintiffs are the Los Angeles County workers who are plaintiffs in the case against the County, and an AFClO-affiliated union representing government employees. The amicus briefs raise some additional arguments and policy issues.
We resolve these issues as follows: (I) On its face, section 20028, subdivision (a)'s paid-by-public-funds requirement applies only to state employees. Section 20028, subdivision (b) which governs employees of contracting non-state government entities like MWD, does not include such a requirement. Following standard statutory *520 construction rules, we assume the Legislature meant to distinguish the two groups of employees, and we decline to read a "paid by public funds" requirement into subdivision (b). Moreover, we conclude PERL's legislative history supports an intent to treat the two types of employees differently, thus supporting our facial reading of the statute. In any event, MWD contracted with the providers to supply workers, and paid them to do so under those contracts. Thus, MWD paid funds to acquire workers.
(II) PERL requires that employees of public agencies contracting with CAPERS, like MWD, who meet PERL's employee definition and are not otherwise excluded from coverage by PERL, are eligible for CALPERS enrollment. Qualifying employees cannot be excluded because the contracting agency has a merit hiring or civil service system under which employees eligible for CALPERS enrollment are not permanent employees of the contracting agency. Our conclusion is particularly applicable here because MWD essentially selected and used these workers under its merit hiring criteria, but chose not to technically hire them under that system solely to avoid providing CAPERS benefits.
(III) Unlike other statutory schemes which expressly recognize co-employment between two "employers," PERL does not recognize co-employment status. We decline to judicially create a co-employment scheme within PERL, a task properly for the Legislature. In any event, here, the workers were not truly "employees" of the providers, which merely serve as a payroll service for MWD.
(IV) Because PERL eligibility is created by statute, not contract, the workers did not waive their right to CALPERS eligibility by signing contracts with the providers which stated the workers were the providers' employees.
Thus, we agree with the trial court that, under these facts, MWD is required to enroll all common law employees in CAPERS. We deny the writ petitions.

PROCEDURAL HISTORY
Under the third consolidated petition (the operative pleading), the case combines 1) a petition for writ of mandate by the workers against MWD, alleging causes of action for violating MWD's duty under PERL to enroll the workers in CALPERS and its duty to provide them with compensation, benefits, and employment rights under MWD's Administrative Code; and 2) a complaint against the providers for unfair business practices. (Bus. & Prof. Code, § 17200 et seq.) CALPERS intervened in the litigation, joining the workers.
The workers are Dewayne Cargill, Anvar Alfi, John Sims, Paul Broussard, Joseph Zadikany, Sun Son, Charlotte Manuel, Steven Minor, and Lisa Nelson. The providers include CDI Corporation, Comforce Technical Services, Inc., H.L. Yoh Company, MD Technical Services Co. (formerly McDonnell Douglas Technical Services Co.), Peak Technical Services, Superior Technical Resources, Inc. (formerly Superior Design Co., Inc.), Superior Staffing Services, Inc., Volt Information Sciences, Inc., Volt Management Corp., and Westaff (USA), Inc. Unless otherwise relevant, the workers will be so designated collectively, and the providers will be so designated collectively.
The trial court certified for resolution what it labeled Issue A: "Whether MWD is mandated by ... [PERL] to enroll all common law employees in" CALPERS. MWD sought summary adjudication, asking the court to answer the question negatively, in a motion dated April 3, 2000. In a document dated the same day, the providers joined MWD's motion. Through *521 their own document also dated April 3, 2000, the workers submitted a memorandum addressing the certified issue, asking the court for an affirmative answer. In a document dated December 22, 2000, CAPERS moved "for a legal determination" of that issue, also asking for a yes answer.
MWD filed a separate statement of undisputed facts supporting its summary adjudication motion. CALPERS filed an opposing separate statement.
The parties submitted evidence and declarations supporting their positions, and each filed objections to some of the opposing evidence and declarations. The trial court did not rule on any of these objections either during oral argument or in its written statement of decision. At the beginning of oral argument, MWD's counsel referred to MWD's objections to some of plaintiffs' evidence and asked: "Do you wish to take those up?" The court replied: "No, I do not." None of the parties raised the issue again or pressed for any rulings on the objections. On appeal, although they categorize some facts differently, the parties treat the facts as undisputed. None of the parties objects to our considering any of the record evidence, or challenges the trial court's implied overruling of the objections and consideration of all the evidence.[1]
On February 9, 2001, the trial court issued a 10-page statement of decision, addressing all the issues raised by the parties. The trial court "resolved [Issue A] as follows: [1] MWD is mandated by [PERL] to enroll all common law employees in" CALPERS. We review that ruling in these proceedings.

FACTS
According to MWD's statement of undisputed facts, MWD's Administrative Code empowers its Board to set the number of permitted permanent employees and requires that employees be hired only through MWD's merit hiring process.
CALPERS submitted documents memorializing its relationship with MWD. As noted, MWD has contracted with CAPERS since January 1, 1945. MWD's workers participated in an election in October 1944, and chose to participate in CAPERS. Before the election, MWD communicated with CALPERS about which workers were employees and thus should receive ballots. MWD and CALPERS agreed that an engineer who worked at an MWD reservoir half-time "would qualify as an employee." However, MWD and CAPERS agreed that attorneys, title searchers, appraisers, and a bacteriologist were independent contractors, not employees. The attorneys were "paid retainers, the payments being called just that, and [] they maintained] their own offices, and c[a]me and [went] as they please[d].... [They were] assigned work from time to time, and [] put in whatever time [wa]s necessary to complete it, but they d[id] not have offices at" MWD. The appraisers and title searchers were "employed only occasionally," and had their own off-site "offices[.]" *522 The bacteriologist was "furnished with samples of water to test in his own lab[o]ratory, or he t[oo]k[] the testing apparatus and chemicals to the place where the water [wa]s to be tested, but t[oo]k[] them from his own place. The appraisers [we]re on much the same basis."
CALPERS submitted contracts and depositions demonstrating it long had used the common-law control test to determine which workers of contracting agencies were "employees" entitled to CALPERS enrollment.
In 1994, CALPERS conducted a routine audit of MWD. In its concluding report, CALPERS found a worker MWD claimed was an independent contractor "was an employee[.]" The report stated: "We reviewed contracts between [MWD] and 14 individuals who provided various types of services to [MWD]. The contracts did not specify the contractor's working arrangements. Therefore, using the common law control test from the State Administrator's Handbook, we interviewed district staff to determine the nature of the working arrangements between the contractor and [MWD]. [f] We found that one retiree's duties as an independent contractor were identical to his duties when he was an employee. He also had virtually the same access to the district's facilities and staff. These conditions are indicative of an employer-employee relationship." (Emphasis added.) The report recommended that "[t]he contracts between independent contractors and the district should specify the working arrangements and specific duties to be performed by the contractor. [H][MWD] should examine all working arrangements with its independent contractors using the State Administrator's Handbook, IRS 20-Questions, during the audit period and subsequently. If any arrangements could be interpreted to be an employer-employee relationship, [MWD] should contact the PERS Membership Review Unit to determine the relationship in the proposed contract language. [¶] ... [¶] We found that [MWD] inappropriately classified a retired annuitant as a contractor. [MWD] should ensure that all retired annuitants and employees are properly classified as such and not as independent contractors." (Emphasis added.) In its written response to the report, MWD did not object to any of the findings or recommendations, or state any proposed action other than compliance. MWD's response concluded: "Your comments regarding our CALPERS membership and payroll reporting are appreciated."
MWD's undisputed facts also stated that MWD "entered into contracts with ... [the] providers ... to provide a variety of different types of temporary personnel to" MWD. (Emphasis added.) "The agreements between [MWD] and the [providers] specifically provide that the [providers] perform their services in the capacity of an independent contractor with respect to" MWD. The MWD/provider contracts required the providers to carry workers' compensation insurance for the workers. The workers "performed assignments at [MWD] pursuant to contracts entered into between [the workers] and the" providers. The workers technically "were not hired pursuant to [MWD]'s merit selection system [in its] Administrative Code, but rather through contracts with their respective" providers. The workers "were not appointed to public employment positions with [MWD] under [its] Administrative Code [] but rather obtained their assignments created by [MWD] pursuant to [MWD]'s contracting authority." (Emphasis added.) The workers "entered into contracts with their respective [providers] regarding the terms and conditions for the provision of temporary services." (Emphasis *523 added.) "The contracts between [the workers] and their respective [providers] provide that [the workers] will perform services for the [providers'] clients." The providers issued the workers' paychecks and W-2 forms, withheld tax, FICA, and FUTA payments, and provided retirement, medical, vacation, and leave benefits as required in the contracts between the workers and their respective providers. The workers knew they would receive no benefits from MWD and were not considered employees by MWD.
In support of its summary adjudication motion, MWD attached five contracts between MWD and various providers as exhibits to Janet Freyberger's declaration. Freyberger had worked at MWD since 1992 and was a senior human resources analyst, responsible for maintaining records relating to MWD's contracts with the providers. The attached contracts were similar and had been entered into between 1990 and 1998.
For example, MWD's contract with one of the providers, Fame Forever, Inc. (d.b.a. Fame Personnel Services) stated that MWD "require[d] the services of [Fame] to provide Temporary Personnel Placement Services for [MWD]'s Human Resources Division." The contract provided that MWD "engage[d] [Fame] to provide temporary personnel to assist [MWD]'s Human Resources Division in staffing for noncapital projects on an as-needed basis.... [¶] ... [¶][] Each request for services to be provided by [Fame] ... shall be authorized by [MWD's] Agreement Administrator who shall provide [Fame] with a job description, a schedule indicating the time the service is required, desired pay rate, and other information necessary for [Fame] to provide [MWD] with temporary employees to help meet [MWD']s work load. The Agreement Administrator shall have the right to approve or reject [Fame]'s candidate. [][] The Agreement Administrator shall notify [Fame] should [MWD] decide to terminate [Fame]'s employee for any reason." (Emphasis added.)
Regarding compensation, the contract stated: "For each candidate provided by [Fame] for [MWD], the Agreement Administrator and [Fame] shall agree on the direct rate to be paid to the candidate and the billing rate to be paid by [MWD] to [Fame] for the candidate's services if that candidate is approved for a job by [MWD] in accordance with the [attached] Fee Schedule.... [¶][] [Fame] employees shall work the same schedule as [MWD] employees at assigned work location[s]. [MWD] work schedules vary for each work location and may include work weeks in excess of 40 hours. Overtime rates only apply when: 1) [Fame]'s employee receives [MWD] supervisor approval prior to working overtime; 2)[] [Fame]'s employee has worked the normal scheduled work week for the assigned work location; and 3) in accordance with applicable State, Federal, and Local laws. [Fame] shall be compensated for overtime at one and one-half times the Bill Rate in the Fee Schedule...." (Emphasis added.)
The contract stated that "neither [Fame] nor any of its employees shall be considered to be an employee or agent of [MWD]." The Scope of Work contract addendum stated that Fame "recruitment/selection shall include pre-screening resumes and applications, conducting] personnel interviews and test[ing] prospective employees, prior to referring them to" MWD. The addendum's Hiring Policy stated that Fame's "hiring policy must contain written verification that [Fame]'s employees understand they are [Fame]'s employees, not employees of [MWD]. [¶] ... [¶] [Fame] shall not increase the rate charged to [MWD] for any of [Fame]'s employees *524 without prior written authorization of [MWD]'s Agreement Administrator, [¶] Supervision and evaluation of [Fame]'s employees shall be accomplished by [Fame]; however, [Fame] may request input from" MWD.
Also in support of its motion, MWD attached copies of the portions of the depositions of the worker plaintiffs, and copies of the deposed workers' employment contracts, to its attorney's authenticating declaration. For example, Paul Broussard's contract with Harte Enterprises, entered into on August 10, 1994, stated that Harte "hires [Broussard] and [Broussard] [] accepts temporary employment from [Harte]...." Under the contract, once Broussard began working for a Harte client, Broussard's "[s]ervices shall be performed at the location specified by [Harte], which shall normally be the offices of [Harte]'s client specified in the `Temporary Assignment Agreement,' a copy of which is attached hereto as Exhibit `A.' [¶][] [Broussard] shall do and perform all Services, acts or things necessary or advisable to assure the provision of the required Services. [Broussard] shall ordinarily determine how the required Services are to be performed subject to the supervision of the applicable representative of [Harte]'s client. [Harte] shall not control the manner in which such Services are performed or supervise such performance; however, [Harte]'s client may so supervise." (Emphasis added.) The contract permitted Harte's client to terminate Broussard any time upon notice.
Plaintiffs submitted declarations of several workers who were members of the class of workers similarly situated to the plaintiff/workers. The declarations stated that the workers were interviewed and hired directly by MWD personnel, who then referred them to one of the providers. The newly hired workers then contracted with one of the providers. The workers had no contact with the providers except regarding payroll issues. The workers' hours, assignments, tasks, evaluations, promotions, and, where applicable, eventual terminations, were determined by MWD personnel. These workers all worked full-time at MWD. While originally told they would be working on one project, all these workers worked on multiple projects during their time at MWD. These workers, and the worker/plaintiffs, all worked for several years at MWD.

DISCUSSION

STANDARDS GOVERNING REVIEW AND STATUTORY INTERPRETATION
As noted, the trial court asked the parties to address the issue before us. As certified, the issue was legal. However, the trial court and the parties considered the issue as a summary adjudication motion. The parties submitted evidence and competing statements of disputed and undisputed facts. The trial court considered all the evidence, not ruling on the parties' objections to some of the proffered evidence. The parties did not seek rulings, thus waiving any challenge to the evidence. On appeal, the parties treat the facts as essentially undisputed. Thus, like the trial court and the parties, we review a summary adjudication motion, much as we would a summary judgment motion.
Summary judgment is proper if the "affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken" in support of and in opposition to the motion "show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subds. (b), (c); PMC, Inc. v. Saban Entertainment, *525 Inc. (1996) 45 Cal.App.4th 579, 590, 52 Cal.Rptr.2d 877.)
Additionally, in ruling on a summary judgment motion, "[t]he determination whether facts have been adduced ... which present triable issues of fact is to be made in the light of the pleadings." (Leasman v. Beech Aircraft Corp. (1975) 48 Cal.App.3d 376, 380, 121 Cal.Rptr. 768.) In general, the court may only examine the pleadings to define the issues of which summary judgment disposes. (Rochlis v. Walt Disney Co. (1993) 19 Cal.App.4th 201, 210, 23 Cal.Rptr.2d 793, disapproved on another ground in Turner v. Anheuser-Busch, Inc. (1994) 7 Cal.4th 1238, 1251, 32 Cal.Rptr.2d 223, 876 P.2d 1022; Hooks v. Southern Cal. Permanente Medical Group (1980) 107 Cal.App.3d 435, 442, 165 Cal. Rptr. 741.) It may not consider the factual allegations of the pleadings except as such facts are uncontradicted by the papers submitted on the motion. (Wiler v. Firestone Tire & Rubber Co. (1979) 95 Cal.App.3d 621, 626, 157 Cal.Rptr. 248; accord, Code Civ. Proc., § 437c, subd. (o).) "The purpose of a motion for summary judgment is `to penetrate through evasive language and adept pleading and ascertain the existence or absence of triable issues.'" (Thompson v. Williams (1989) 211 Cal.App.3d 566, 572, 259 Cal.Rptr. 518, quoting from Chern v. Bank of America (1976) 15 Cal.3d 866, 873, 127 Cal.Rptr. 110, 544 P.2d 1310.) However, a defendant seeking summary judgment may rely on the factual allegations of the complaint, which constitute judicial admissions. (Foxborough v. Van Atta (1994) 26 Cal. App.4th 217, 222, fn. 3, 31 Cal.Rptr.2d 525.)
On appeal, we independently examine the facts and determine their effect as a matter of law. (PMC, Inc. v. Saban Entertainment, Inc., supra, 45 Cal. App.4th at p. 590, 52 Cal.Rptr.2d 877.) We are not bound by the trial court's stated reasons, if any, for its ruling; we review the ruling, not the rationale. (Jacoves v. United Merchandising Corp. (1992) 9 Cal.App.4th 88, 102, 11 Cal. Rptr.2d 468; Stratton v. First Nat. Life Ins. Co. (1989) 210 Cal.App.3d 1071, 1087, 258 Cal.Rptr. 721.)
Here, resolution of all the issues involves statutory interpretation of PERL, and the interplay between PERL and the contracts between CALPERS and MWD, MWD and the providers, and the providers and the workers.
"The interpretation of a statute ... is a question of law...." (California Teachers Assn. v. San Diego Community College Dist. (1981) 28 Cal.3d 692, 699, 170 Cal.Rptr. 817, 621 P.2d 856.) "`Interpretation and applicability of a statute or ordinance is clearly a question of law.' [Citation.] It is the duty of an appellate court to make the final determination from the undisputed facts and the applicable principles of law. [Citation.]" (Sutco Construction Co. v. Modesto High School Dist. (1989) 208 Cal.App.3d 1220, 1228, 256 Cal. Rptr. 671.) Thus, we interpret the challenged statute de novo as a matter of law.
In interpreting statutes, our primary goal is to give effect to the Legislature's intent in enacting the law. "`To determine intent, "`The court turns first to the words themselves for the answer.'"' [Citation.]" (In re Littlefield (1993) 5 Cal.4th 122, 130, 19 Cal.Rptr.2d 248, 851 P.2d 42). "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citations.]" (People v. Knowles (1950) 35 Cal.2d 175, 183, 217 P.2d 1.) A `""cardinal rule of construction is that ... a construction making some words surplusage is to be *526 avoided."' [Citation.]" (State of South Dakota v. Brown (1978) 20 Cal.3d 765, 776-777, 144 Cal.Rptr. 758, 576 P.2d 473.)
Statutory interpretation involves a three step analysis. "First, a court should examine the actual language of the statute. [Citations.] Judges, lawyers and laypeople all have far readier access to the actual laws enacted by the Legislature than the various and sometimes fragmentary documents shedding light on legislative intent. More significantly, it is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed `into law' by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's `legislative history.'
"In examining the language, the courts should give to the words of the statute their ordinary, everyday meaning [citations] unless, of course, the statute itself specifically defines those words to give them a special meaning [citations].
"If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. [Citations.] ...
"But if the meaning of the words is not clear, courts must take the second step and refer to the legislative history. [Citations.]
"The final stepand one which we believe should only be taken when the first two steps have failed to reveal clear meaningis to apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations]." (Halbert's Lumber, Inc. v. Lucky Stores, Inc. (1992) 6 Cal.App.4th 1233, 1238-1240, 8 Cal.Rptr.2d 298.) We apply these undisputed rules to our review of PERL.
In addition to these general statutory construction rules, the parties recite several specific statutory construction canons relevant to our analysis of PERL. 1) We must read PERL as a whole, giving effect to all its provisions, neither reading one section to contradict others or its overall purpose, nor reading the whole scheme to nullify one section. "The rules governing statutory construction are well established. Our objective is to ascertain and effectuate legislative intent. [Citations.] ... In this regard, all parts of a statute should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others. [Citations.]" (City of Huntington Beach v. Board of Administration (1992) 4 Cal.4th 462, 468, 14 Cal. Rptr.2d 514, 841 P.2d 1034 [construing PERL].) "[Legislation must be construed as a whole while avoiding an interpretation which renders any of its language surplusage. [Citation.]" (Ibid.)
2) If statutory language is ambiguous, we must construe statutes to ensure reasonable, not absurd, results, consistent with overall legislative intent. "When uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation. [Citation.] In this regard, it is presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences. [Citations.] `"[W]here the language of a *527 statutory provision is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted."' [Citation.]" (Harris v. Capital Growth Investors XIV (1991) 52 Cal.3d 1142, 1165-1166, 278 Cal.Rptr. 614, 805 P.2d 873.)
3) We must presume statutes incorporate analogous common law definitions unless a) the statute expressly rejects them, or b) two potentially conflicting provisions cannot otherwise be reconciled. "As a general rule, `[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules. [Citation.] "A statute will be construed in light of common law decisions, unless its language `"clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law rule concerning the particular subject matter...." [Citations]' [Citation.]'" [Citation.] Accordingly, `[t]here is a presumption that a statute does not, by implication, repeal the common law. [Citation.] Repeal by implication is recognized only where there is no rational basis for harmonizing two potentially conflicting laws.' [Citation.]" (California Assn. of Health Facilities v. Department of Health Services (1997) 16 Cal.4th 284, 297, 65 Cal. Rptr.2d 872, 940 P.2d 323.)
This canon applies to the definition of employment. "[A]s a general rule, when `employee' is used in a statute without a definition, the Legislature intended to adopt the common law definition and to exclude independent contractors. [Citations.]" (People v. Palma (1995) 40 Cal. App.4th 1559, 1565-1566, 48 Cal.Rptr.2d 334.)
4) Where the Legislature makes express statutory distinctions, we must presume it did so deliberately, giving effect to the distinctions, unless the whole scheme reveals the distinction is unintended. This concept merely restates another statutory construction canon: we presume the Legislature intended everything in a statutory scheme, and we should not read statutes to omit expressed language. As our Supreme Court stated, "we are aware of no authority that supports the notion of legislation by accident." (In re Christian S. (1994) 7 Cal.4th 768, 776, 30 Cal.Rptr.2d 33, 872 P.2d 574.) While not all parties rely on all these canons, none dispute they all generally govern statutory interpretation.

I
Plaintiffs argued and the trial court found that PERL required MWD to enroll all its common law employees in CAPERS. MWD contends that section 20028 of PERL denies such an enrollment right to workers who may be common law employees but are not paid by funds controlled by MWD. MWD argues that because the workers' compensation came from the providers, not MWD, the workers are not eligible for CALPERS enrollment. We conclude otherwise.
PERL is codified in section 20000 et seq. Its predecessor, the State Retirement Law, was first enacted in 1931 to govern the state retirement/pension system for state employees. In 1939 and 1943, respectively, first cities and later all California public agencies were invited to join the system.
"The purpose of [PERL] is to effect economy and efficiency in the public service by providing a means whereby employees who become superannuated or otherwise incapacitated may, without hardship or prejudice, be replaced by *528 more capable employees, and to that end provide a retirement system consisting of retirement compensation and death benefits." (§ 20001.)
"Any public agency may participate in and make all or part of its employees members of this system by contract entered into between its governing body and the board pursuant to this part ...." (§ 20460, emphasis added.) Under section 20022, a "`[contracting agency' means any public agency that has elected to have all or any part of its employees become members of this system and that has contracted with the board for that purpose." As noted, MWD has been such a contracting agency since January 1, 1945.
However, when an agency like MWD contracts with CALPERS, "[t]he exclusions of employees ... [from CALPERS membership] shall be based on groups of employees such as departments or duties, and not on individual employees. The exclusions of groups may be made by amendments to contracts, with respect to future entrants into the group. The board may disapprove the exclusion of any group, if in its opinion the exclusion adversely affects the interest of this system. Membership in this system is compulsory for all employees included under a contract. ..." (§ 20502, emphasis added.)
"`A contract with PERS subjects the contracting agency to the [PERL] "and all amendments thereto applicable to members, local miscellaneous members, or local safety members except such as are expressly inapplicable to a contracting agency unless and until it elects to be subject to such provision." ( ... § 20506.)' [Citation.] Whether a local agency employee legally falls within a statutory definition that is incorporated into the local agency's contract with PERS, is a question of statutory interpretation. [Citations.] Furthermore, statutes defining the scope of PERS benefits cannot be qualified by bargaining agreements. [Citation.]" (County of Mono v. Public Employees' Retirement System (1999) 69 Cal.App.4th 1105, 1112-1113, 82 Cal.Rptr.2d 130, emphasis added.)
Under PERL, "`member' means an employee who has qualified for membership in this system and on whose behalf an employer has become obligated to pay contributions." (§ 20370, subd. (a).) The rest of section 20370 defines the various state and contracting agency members included in the system.
Section 20300 excludes from CALPERS membership, among others, "[independent contractors who are not employees...." (Subd. (b).) Section 20281 provides: "All members of the retirement system immediately prior to the time this part becomes operative continue to be members of this system. [¶] An employee of a contracting agency on the effective date of its contract with the board becomes a member immediately, [¶] Every other employee becomes a member upon his or her entry into employment." (Emphasis added.)
"If provisions of [PERL] are ambiguous or uncertain, they are to be liberally construed in favor of the pensioner. [Citation.] In such cases, the Board's interpretation of [PERL] is accorded great weight unless clearly erroneous. [Citations.]" (City of Fremont v. Board of Administration (1989) 214 Cal.App.3d 1026, 1033, 263 Cal.Rptr. 164.)
MWD relies on section 20028, which, as relevant, states: "`Employee' means: [H] (a) Any person in the employ of the state ..., a county superintendent of schools, or the university whose compensation, or at least that portion of his or her compensation that is provided by the state, a county superintendent of schools, or the university, is paid out of funds directly controlled *529 by the state, a county superintendent of schools, or the university, excluding all other political subdivisions, municipal, public and quasi-public corporations. `Funds directly controlled by the state' includes funds deposited in and disbursed from the State Treasury in payment of compensation, regardless of their source. [Emphasis added.]
"(b) Any person in the employ of any contracting agency. [¶] (c)....
"(d) Any person in the employ of a school employer. [¶] (e)...."
MWD makes the following argument: 1) Section 21354 explains how to calculate CALPERS pension benefits for "local miscellaneous members" such as MWD's employees: add employer contributions to the employee's contributions at retirement, "to equal the fraction of one-fiftieth of the member's final compensation" in a table included in the section, "multiplied by the number of years of current and prior service[,]" with certain exceptions. (Emphasis added.) 2) Section 20069, subdivision (a), defines "[s]tate service" as "service rendered as an employee ... of ... a contracting agency, for compensation, and only while he or she is receiving compensation from that employer therefor (Emphasis added.) 3) Section 20630 defines "compensation" as "the remuneration paid out of funds controlled by the employer in payment for the member's services performed[.]" 4) Section 20054 defines "pension" as "payments for life derived from contributions made from employer controlled funds."
Thus, MWD essentially argues that, since the workers' ultimate pension amount will be determined by, among other things, their final "compensation," and since "compensation" means payment from employer controlled funds, and since the workers were paid by the providers rather than the contracting agency, the workers would not receive any benefits if they were made eligible for CALPERS benefits. Since it would be absurd to make them eligible for benefits when their benefits would equal zero, MWD concludes the Legislature must have meant to include the "paid out of funds directly controlled by" language of section 20028, subdivision (a), into subdivision (b). Since the workers were not paid by MWD funds, MWD concludes they cannot be "employees" eligible for CALPERS benefits.
Plaintiffs respond, without dispute from MWD, that, under PERL, all a contracting agency's "employees" are eligible for membership, and must be enrolled in CALPERS unless they are excluded either under PERL (such as independent contractors, as noted above) or in the agency's contract with CALPERS. MWD does not dispute that the workers are not otherwise excluded under its CALPERS contract. Plaintiffs also argue, again without dispute, that, under PERL, as noted, only groups, not individuals, may be excluded from membership. The Legislature enacted PERL as part of a comprehensive plan to achieve efficiency and economy in government service in two ways. First, the Legislature wanted to attract and retain qualified government workers by providing PERL benefits in addition to salaries, often less than in the private sector. Second, the Legislature made PERL applicable to all employees, permitting their exclusion only when permitted by PERL or the contracting agency's contract with CALPERS, and even then only in groups, not as individuals. Plaintiffs argue PERL and CALPERS in its relations with contracting agencies, specifically MWD, always have applied the common law control test to determine whether a worker is an employee. Under that test, the worker/plaintiffs are, and always have been, common law MWD employees entitled to *530 CALPERS enrollment. Thus, MWD's statutory analysis is wrong because the worker/plaintiffs are and always have been "employees" entitled to PERL membership. Thus, MWD's analysis does not justify grafting a "paid by public funds" requirement into subdivision (b) of section 20028, because doing so would exclude many common law employees from PERL, violating PERL's overall intent that all common law employees of contracting agencies are entitled to CALPERS membership.
Moreover, plaintiffs argue, MWD's position confuses the amount of benefits to which individual workers are entitled, determined by CALPERS on an individual basis for each worker, with the separate issue whether the workers are eligible for enrollment. The rules determining any particular worker's benefit level should not be read to deny workers all eligibility for benefits.
MWD asks us to read the "paid by public funds" requirement, present in subdivision (a), into subdivision (b), where it is absent. MWD argues this distinction was a drafting accident which occurred when an earlier version of section 20028, which lacked subdivisions, was rewritten to include subdivisions. MWD's position also requires us to assume all the references in the above sections to "employ," "employee," and "employer" do not incorporate the existing common law to determine whether a particular worker is an employee of a contracting agency like MWD.
First, we reject MWD's claim that the Legislature inadvertently omitted a "paid by public funds" requirement from subdivision (b) of section 20028, although it expressly included the requirement in subdivision (a). Before section 20028's predecessor was divided into subdivisions, it read: "`Employee' shall mean any person in the employ of the State of California whose compensation, or at least that portion of such compensation which is provided by the State, is paid out of funds directly controlled by the State, and, for the purpose of this act, any person in the employ of the university whose compensation, or at least that portion of such compensation which is provided by the university, is paid out of funds directly controlled by the university, excluding all other political subdivisions, municipal, public and quasi public corporations; in addition to other funds so controlled, funds deposited in the State treasury and disbursed therefrom in payment of compensation, regardless of the source from which they were derived, shall be considered as directly controlled by the State, for the purposes of this section; and, for the purposes of this act, any person in the employ of any contracting city who is included by contract under the retirement system." (Emphasis added.)
This section and its predecessors have been amended 19 times and the Legislature never has chosen to add the paid by public funds requirement to subdivision (b). Because of its evolution from an exclusively State to a general public pension, retirement, and benefit system, which can be joined by other entities under specific contracts, PERL always has distinguished between the State and other public entities. MWD's argument that the Legislature meant the "paid by public funds" requirement to apply to contracting agency workers is contradicted by both section 20028's express language and its undisputed legislative history.
Second, we reject MWD's argument that PERL does not incorporate the common law definition of employment. Nowhere does MWD show PERL's express rejection of the common law. And we are not convinced that MWD's convoluted *531 tracing of some of PERL's provisions regarding how to compute the amount of benefits payable to a PERL enrolled and eligible employee is consistent with section 20028, subdivision (b)'s plain language.
Under the common law, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. [Citation.] If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established. [Citation.]" (Tieberg v. Unemployment Ins.App. Bd. (1970) 2 Cal.3d 943, 946-947, 88 Cal.Rptr. 175, 471 P.2d 975.) Tieberg continued and reaffirmed (id. at p. 950, 88 Cal.Rptr. 175, 471 P.2d 975) that other factors combined with control must be looked at to decide if a worker is an independent contractor or an employee. "`In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citations.] Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. [Citation.]'" (Id. at p. 949, 88 Cal.Rptr. 175, 471 P.2d 975.) Tieberg applied this definition to affirm a trial court's finding a private sector worker an employee.
Earlier, the Supreme Court applied a similar test to a public worker to find a Superior Court reporter was an employee, not an independent contractor, although he also prepared transcripts for civil cases, for which he was paid directly by the requesting party. (City of Los Angeles v. Vaughn (1961) 55 Cal.2d 198, 200-202, 10 Cal.Rptr. 457, 358 P.2d 913.)
Greenaway v. Workmen's Comp.App. Bd. (1969) 269 Cal.App.2d 49, 54-59, 74 Cal.Rptr. 452, found a tax appraiser a public employee of the court for which he worked, primarily because he could be fired without cause. The court so concluded although the appraiser also was paid some fees for working for private parties. After the Legislature changed the law to prohibit firing of such appraisers without cause, Adcock v. Board of Administration (1979) 93 Cal.App.3d 399, 155 Cal.Rptr. 596 found an appraiser not eligible for state employment, both because he was an independent contractor and because he was not paid by state funds. The latter requirement applied because Adcock was seeking to be designated a state, not contracting agency, employee.
Finally, although not binding authority, the Attorney General opined that whether a home health worker paid by the person being assisted with funds given the assisted person by a contracting CALPERS *532 public agency was the agency's employee "is governed by [PERL] and specifically sections 20334 and 20336." (68 Opns. Cal. Atty. Gen. 194, 201 (1985).)
"In an employment relationship, the employer is generally fully liable for the employee's actions and therefore is motivated to supervise and control the employee. The independent contractor relationship, on the other hand, is not subject to such control and cannot be regulated. [Citing Tieberg.]" (People v. Palma, supra, 40 Cal.App.4th at p. 1566, 48 Cal. Rptr.2d 334.)
While they do not concede the point, neither MWD nor the providers seriously dispute that, on these undisputed facts, the workers were MWD's common law employees under the control test used by CALPERS to define who is an employee under PERL. MWD and the providers argue the providers hired, employed, and paid the workers. However, MWD and the providers use those terms only in the technical sense that the workers, on MWD's orders, signed employment contracts with the providers which said the workers were hired, employed, and paid by the providers. MWD does not seriously dispute that MWD, not the providers, selected and chose the individual workers, determined their salary and duties, supervised them, and chose whether to promote, discipline, or fire them. Of course, MWD and the providers dispute that the common law employee definition controls in this situation. We agree with the plaintiffs that, under the common law test of employment, the workers were not employed by the providers, which merely provided payroll services to MWD.
As noted, our record discloses that, contrary to MWD's claim, CALPERS consistently has employed the common law control test to define employment in its relations with contracting agencies in general, and MWD in particular. In 1944, when MWD held its election to see if its employees wanted to join PERL, CALPERS advised MWD to use the common law test to decide which of its workers were employees entitled to vote. More recently and significantly, CAPERS' 1994 audit told MWD to use that test to determine whether workers were independent contractors or employees, regardless of who paid the workers. MWD accepted CALPERS' recommendation without objection. CALPERS' long use of the common law to determine employment supports plaintiffs' argument that we should likewise interpret PERL to incorporate that test.
As noted earlier, while not dispositive, courts give weight to the statutory interpretation and application by entities established for their implementation. "Although the interpretation of a statute is ultimately a question of law for the court (Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1, 7, 78 Cal.Rptr.2d 1, 960 P.2d 1031 ...), a certain deference to PERS's interpretation is appropriate. PERS possesses expertise in interpreting the statutory scheme within its administrative jurisdiction, and the criteria used by PERS are of long-standing duration. (Id., at pp. 11-13, 78 Cal. Rptr.2d 1, 960 P.2d 1031.)" (Silver v. Los Angeles County Metropolitan Transportation Authority (2000) 79 Cal.App.4th 338, 357, 94 Cal.Rptr.2d 287.)
Our conclusion is consistent with PERL as a whole, and results in a rational reconciliation of its provisions. PERL is comprehensive and mandatory, in that contracting entities must include all their employees within it. Workers can be excluded only through statutory exceptions enacted by the Legislature, or as members of a group of workers excluded under the contracting agency's contract with *533 CALPERS. Only groups of workers, not individuals, can be excluded, and only then under the contracting agency's contract with CALPERS. PERL expressly excludes common law independent contractors, which these workers are not, but includes all common law employees, unless the contracting agency and CAPERS agree to exclude an entire class of workers in a contract. PERL thus envisions a comprehensive pension/retirement system designed to provide benefits to all eligible employees as defined in PERL and covered by contracts with contracting agencies. By specifically excluding independent contractor workers, PERL provides agencies the flexibility to control their labor costs by contracting out tasks to independent contractors. While MWD tried to label the worker/plaintiffs independent contractors, the label was a fiction, albeit an open one, to try and add common law employees to MWD's work-force, maintaining control over jobs and individual workers, while denying these workers eligibility for CALPERS benefits.
Conversely, MWD's interpretation would be unreasonable, because it would use a portion of the provisions determining the amount of benefits to completely exclude otherwise eligible workers from any coverage. Moreover, it would permit MWD, and by extension all other agencies, to avoid its obligations under its CAPERS contract, but without formally negotiating to withdraw from the contract or openly negotiating changes in labor contracts.
We think an analogy offered by amicus AFL-CIO affiliate American Federation for State, County, and Municipal Employees Union, local 1902, is apt. In the traditional independent contractor context, a public entity contracts with, say, a contractor to build a bridge for the public entity. The contract calls for the entity to pay the contractor a specified amount for a bridge of specified dimensions and construction quality. The entity pays the contractor, but does not specify how the contractor does the job, how many workers the contractor uses, or the workers' salaries or benefits. Other than the finished product, the entity has no control over how the contractor builds the bridge, although it may be entitled to inspect construction at intervals to assure the specified materials are used and the bridge is built as specified. The public funds paid the contractor are for a bridge, not for the services of individual workers.
In contrast, here, MWD selected the workers, some of whom initially were screened by the providers. Nonetheless, MWD decided whether any particular applicant would work at MWD. MWD determined the salary and benefits the worker would be paid, and decided how long the worker remained at MWD. MWD determined what jobs the worker did, where he worked, his hours, supervised his performance, decided whether he received a raise, how much the raise would be, and paid the provider a set amount of public funds essentially as a payroll service for each worker, under detailed contracts with the providers. The amount MWD paid each provider varied depending on how many workers, and at what salaries (all set by MWD), received their paychecks from a particular provider. While MWD claims the providers "hired" the workers, they use that term only in the technical sense that MWD told each worker whether he would be "hired" by MWD or a particular provider. Indeed, MWD sometimes transferred workers from one provider to another. Undoubtedly, MWD "employed" the workers under the common law control test. Likewise, the providers did not "employ" the workers under that test, but acted as a payroll service for MWD.
MWD's parade of horribles, hordes of individuals technically eligible for benefits *534 which will amount to zero, is illusory. First, all employees eligible for PERL benefits have their actual benefits determined by CALPERS on an individual, case-by-case basis. Declaring the worker/plaintiffs PERL-eligible merely adds additional individuals to a pool for which CALPERS long has determined benefit levels.
Second, MWD has not established that the sections it cites constitute the only tests for determining benefit levels. The trial court did not decide that issue, which is not before us. Indeed, CALPERS notes that other PERL sections define compensation without using the "paid by public funds" language cited by MWD. Section 20037 states: "[F]or a local member who is an employee of a contracting agency that is subject to [PERL], `final compensation' means the highest average annual compensation earnable by a member during the three consecutive years of employment immediately preceding the effective date of ... retirement...." The same section continues to discuss how an eligible employee can apply to receive credit for previous service time not yet credited. Nowhere does section 20037 require that the employee's compensation must have been paid by public funds. "Compensation earnable" is defined in section 20636, a lengthy section, and case law. (See, for example, Hudson v. Board of Administration (1997) 59 Cal.App.4th 1310, 69 Cal. Rptr.2d 737.) MWD has failed to show the few sections of PERL it has cited in isolation unequivocally compel CALPERS to deny the worker/plaintiffs all benefits, as a means of showing the Legislature meant to impose a "paid by public funds" requirement into subdivision (b) of section 20028.
Thus, we agree with the trial court that MWD is required to enroll all its common law employees in CALPERS.[2]

II
MWD's administrative code requires it to hire permanent employees under its merit hiring system. The plaintiff/workers were not hired under that system. MWD argues that compelling it to enroll its common law employees in CALPERS somehow violates MWD's merit hiring system. MWD makes this claim as an alternative argument why its common law employees cannot be eligible for CALPERS. The contention fails.
As discussed at length in section I, PERL requires contracting agencies like MWD to enroll its common law employees in CALPERS. CALPERS then will determine the enrolled workers' benefits based on PERL requirements. Because, as discussed, entitlement to PERL benefits is statutory, the existence of MWD's merit hiring system, whatever its requirements, *535 cannot alter MWD's contract with CALPERS. Moreover, the plaintiff/workers were hired in substantial, although not technical, compliance with the merit hiring system. MWD selected specific workers for specific jobs based on their having specific skills and experience.
Finally, we need not, and do not, decide whether our decision has any effect on the plaintiff/workers' eligibility for whatever benefits might accrue to them had they been formally hired under the merit system. That issue was not decided below, and is not before us.

Ill
For two reasons, we reject the providers' claim that we should read a co-employment exception into PERL. First, as discussed in section I, PERL incorporates the common law definition of employment. Under that test, the plaintiff/workers are not the providers' employees. On these undisputed facts, the providers merely provided payroll services to MWD. The providers had no control over which workers were selected, their conditions of employment, whether they remained employed or for how long, or their remuneration. The providers only "employed" the workers in the most technical sense, because MWD commanded the workers to sign employment contracts with the providers. Having done so, MWD, not the providers, decided under what conditions, salary, and time the workers continued to work at MWD. Indeed, MWD sometimes transferred workers from one provider to another. Even if PERL incorporated a co-employment exception to this common law definition, that exception would assume the workers were "employed" in some meaningful sense by the providers. Because they were not, we need not decide if such an exception applies.
In any event, the providers acknowledge that PERL contains no such co-employment exception. The providers analogize to other statutory schemes, such as unemployment insurance, where the Legislature has expressly recognized co-employment in the particular statutory scheme. The providers ask us to judicially create such an exception within PERL, essentially arguing that, since the Legislature has done so in other areas, it must have meant to do so in the PERL context. We decline the providers' bald request that we rewrite an extensive legislative system to include a provision not yet contemplated. Such revision is a legislative, not a judicial, responsibility.

IV
Finally, we also reject the claim that the workers waived their right to CALPERS enrollment by signing contracts with the providers that did not provide such benefits. As discussed in section I, entitlement to PERL benefits is created by statute, not contract. Common law employees of contracting agencies are entitled to enrollment, regardless of conflicting labor or other agreements. PERL is designed to be mandatory and comprehensive for contracting agencies. Thus, the plaintiff/workers did not waive their rights by signing the provider contracts, particularly where, as here, the contracts were designed to aid MWD's attempt to deny CALPERS enrollment to its eligible employees.

DISPOSITION
We deny the petitions. Plaintiff workers and CALPERS are awarded their costs.
We concur: SPENCER, P.J., and MALLANO, J.
NOTES
[1] "It is well settled by statute and case authority that the failure to object, even to otherwise inadmissible evidence, waives the defect. [Citations.] [¶] ... The failure to raise [a] specific objection ... waives such argument for purposes of appeal. (Evid.Code, § 353, subd. (a).) Even if the objections raised below could be set within a [particular] analysis, the record contains no ruling on any of the objections. Failure of counsel to secure such a ruling waives the objection. [Citations.]" (Haskell v. Carli (1987) 195 Cal. App.3d 124, 129, 240 Cal.Rptr. 439, fn. omitted.) These general evidentiary principles apply to summary judgment and adjudication motions. (Id. at pp. 129-130, 240 Cal.Rptr. 439; Code Civ. Proc., § 437c, subds. (b), (d). See 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, §§ 371, 389, pp. 460-461, 482.)
[2] As noted, other cases raising similar issues are pending before the trial court. We decline to address any facts or issues raised in other cases, involving, as they must, different retirement systems (such as Los Angeles County's) and workers employed under different facts, contracts, and retirement systems. We expressly limit our discussion to the facts before us and PERL.

We also decline to address MWD's argument, raised for the first time in its reply brief, that applying the "paid by public funds" requirement to state, but not contracting agency workers, raises equal protection concerns. As we must, we ignore arguments, authority, and facts not presented and litigated in the trial court. Issues raised for the first time on appeal which were not argued in the trial court are waived. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 394-398, pp. 444-451.) We ignore contentions made for the first time in reply briefs or at oral argument. (Id., §§ 616, 665, pp. 647-648, 698.) This conclusion is particularly apt where the claim raises complex issues about how the requirement is interpreted, and was not litigated below, preventing the parties from making a record.